# IN THE COURT OF APPEALS OF IOWA

No. 22-0962
Filed May 10, 2023

IN RE THE MARRIAGE OF EDYTA MONIKA CICHON-BARCHE
AND DAVID SEBASTIAN BARCHE

Upon the Petition of
EDYTA MONIKA CICHON-BARCHE, n/k/a EDYTA MONIKA CICHON,
    Petitioner-Appellee,

And Concerning
DAVID SEBASTIAN BARCHE,
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Buchanan County, Andrea J. Dryer,

Judge.

A former husband appeals the dissolution decree, raising custody and

financial issues. **AFFIRMED AS MODIFIED AND REMANDED.**

Kevin D. Engels of Correll, Sheerer, Benson, Engels, Galles & Demro, PLC,

Cedar Falls, for appellant.

Alexander S. Momany of Howes Law Firm, P.C., Cedar Rapids, for

appellee.

Heard by Tabor, P.J., and Schumacher and Ahlers, JJ.

**TABOR, Presiding Judge.**

David Barche appeals custody and financial provisions in the decree dissolving his marriage to Edyta Cichon-Barche. He contends that the district court erred in four ways: (1) awarding joint physical care of their two children; (2) requiring him to pay spousal support; (3) ordering him to pay the guardian ad litem (GAL) fees; and (4) failing to credit him for the amount he paid for the children's medical insurance when calculating the child support award. Edyta requests an award of appellate attorney fees.

After our independent review of the record,[1] we find joint physical care was appropriate, traditional spousal support was equitable, and the court did not err in assigning all court costs, including the GAL fees, to David. But we do find modification necessary on the child support calculation. We remand for the district court to give David credit for his contribution to the children's insurance. Finally, because she prevails on most issues, we find Edyta is entitled to appellate attorney fees, which the court should determine on remand.

## I.    Facts and Prior Proceedings

Edyta and David married in June 2001. Their marriage lasted about twenty-one years. Edyta petitioned for dissolution in November 2020. At the time of dissolution, Edyta was forty-seven and worked at a college making approximately $42,000 per year. David was forty-six and worked as a psychologist at a state

---

[1] Because dissolutions are equitable proceedings, our review is de novo. *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). We give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them. *Id.*

mental-health institute making approximately $90,400 per year. The parties have two children: a daughter in middle school and a son in elementary school.

A temporary order entered in March 2021 granted the parties joint legal custody and joint physical care of their children while this case was pending. They were in David's care every Monday and Tuesday, in Edyta's care every Wednesday and Thursday, and alternated on Fridays through the weekend. The court also ordered David to pay Edyta temporary child support as well as temporary spousal support of $1100 per month.

A May 2022 decree awarded the parties joint custody and joint physical care on a rotating two-week basis; the children switched homes on a two-day, two-day, three-day schedule.[2] The court adopted this arrangement based on the GAL's recommendation. It also awarded Edyta spousal support of $800 per month for ten years. In the child support award to Edyta, the court did not give David credit for maintaining the children's health insurance. And the court ordered David to pay the GAL fees. David appeals.

II.    Analysis

A.  Joint Physical Care

David first contends that the district court erred in awarding the parties joint physical care. In his view, "the parties' various difficulties with maintaining the

---

[2] This schedule differed from the temporary order. Under the decree, the parties followed this two-two-three rotation:

|        | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|--------|--------|---------|-----------|----------|--------|----------|--------|
| Week 1 | David  | David   | Edyta     | Edyta    | David  | David    | David  |
| Week 2 | Edyta  | Edyta   | David     | David    | Edyta  | Edyta    | Edyta  |

shared care arrangement on a temporary basis, the children's struggles with school and their mental health, the children's stated preferences, and the recommendations of the GAL, all suggest primary physical placement with David is in the children's best interest." Edyta counters that "[t]he district court's order of shared care to the parties with a rotating two-week, two-two-three visitation schedule was appropriate and in the best interests of the children."

In considering physical care, our top concern is the children's best interests. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). We are guided by several factors, including "stability and continuity, the degree of communication and mutual respect [between the parties], the degree of discord and conflict prior to dissolution, and the extent to which the parties agree on matters involving routine care." *Id.* at 700. We also consider the characteristics and needs of each child, including age, maturity, mental and physical health; the characteristics of each parent; and the relationships between each child and each parent. *See In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974). And we look to the factors in Iowa Code section 598.41(3) (2020).[3]

---

[3] These factors are:

    a. Whether each parent would be a suitable custodian for the child.

    b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.

    c. Whether the parents can communicate with each other regarding the child's needs.

    d. Whether both parents have actively cared for the child before and since the separation.

    e. Whether each parent can support the other parent's relationship with the child.

"The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. A custody award must assure the children the chance for maximum physical and emotional contact with both parents and encourage the parents to share the rights and responsibilities of raising the children. *See* Iowa Code § 598.41(1)(a); *see also Hansen*, 733 N.W.2d at 696 (finding the statutory factors are relevant in a determination of physical care as well). We only curtail those interactions if contact with one parent is likely to cause "direct physical harm or significant emotional harm to the child[ren]." *Id.*

Here, the district court awarded joint physical care and set a rotating two-week, two-two-three-day schedule. The court explained its decision:

> The court finds that a joint physical care arrangement, using the schedule proposed by the guardian ad litem, will be in the best interests of the children. The parties have shown that they can make a joint physical care arrangement work during the pendency of these proceedings. The parties have different characteristics as parents and approaches to parenting, but, together, their parenting styles can complement and balance each other.

---

f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.

g. Whether one or both of the parents agree or are opposed to joint custody.

h. The geographic proximity of the parents.

i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

j. Whether a history of domestic abuse, as defined in section 236.2, exists. . . .

k. Whether a parent has allowed a person custody or control of, or unsupervised access to a child after knowing the person is required to register or is on the sex offender registry . . . .

Iowa Code § 598.41(3).

The court further reasoned:

> The children are attached to both parties. [Edyta] and [David] are both intelligent individuals who are interested in their children's development and welfare and actively involved in their care. The parties are capable of recognizing and setting aside their distrust, lingering resentment, and criticisms of each other in order to not only refrain from negatively affecting the relationship between the children and the other parent but also put affirmative effort into actively supporting, reinforcing, and making repairs to those relationships. The children will benefit from having as much positive, continuing physical care and emotional contact with both parents as possible.

David contends that he should be awarded physical care of the children. He concedes that several of the factors under section 598.41(3) suggest joint physical care is appropriate. For example, both parties have actively cared for the children during their separation, they live in the same town, and neither the children's safety nor issues regarding domestic abuse are at play here. *See* Iowa Code § 598.41(3)(d), (h), (i), (j). But David insists that the remaining statutory factors suggest joint physical care is not in the best interests of the children.

***Suitable Custodian****.* David first claims that Edyta is not a suitable custodian. Although she was the primary caregiver during the marriage, David became more involved in the children's care after the parties' separation. David alleges that Edyta opposed mental-health counseling for the children, inappropriately involved the children in the dissolution case, and changed the visitation schedule they were following "because it was more convenient for her to follow a different schedule." In response, Edyta acknowledges voicing concerns about the specific counselors the children were seeing and the fact that David did not consult her before choosing them. But she maintains she did not object to

counseling overall. She also points out that both parties discussed the dissolution case with the children.

As for visitation, David testified that they initially did not follow the schedule in the temporary order and instead agreed to a rotating two-two-three schedule. At some point, Edyta told David they needed to follow the temporary order. David resisted that request to change the schedule, but he eventually "went with what Edyta wanted" after the parties argued in front of the children during an exchange. The parties then started following the court-ordered schedule.

***Children's Needs***. David next claims: "Not only did the evidence suggest the children would *not* suffer from a lack of equal time with Edyta, the record suggested the children preferred to spend less time with her than with David." Both children expressed to their GAL that they did not want to be placed in Edyta's primary care or to be in her care for five nights in a row.[4] Based on the children's preferences, the GAL recommended that the court modify the visitation schedule to a rotating two-two-three schedule, so neither parent would have the children for five nights in a row. The court followed that recommendation when it awarded the parties joint physical care.[5]

***Communication***. David also complains that many of their communications result in Edyta claiming he had "done something wrong," and that "Edyta always

---

[4] Under the temporary order, the children were in Edyta's care for five nights in a row on alternating weeks when she had the children on Wednesday, Thursday, Friday, Saturday, and Sunday. The children were in David's care for five nights in a row on alternating weeks when he had the children on Friday, Saturday, Sunday, Monday, and Tuesday.

[5] Under the decree, the children are only in each parent's care for either two or three nights in a row.

had to have the last word." The parties mainly communicate through text messaging. Despite David's complaints, he concedes that "[t]he parties have been able to pass information about the children successfully" and they do not engage in profanity during those exchanges. The district court noted that the parties would benefit from more open communication.

***Support for the Other Parent's Relationship.*** David also claims that Edyta does not support his relationship with the children. He alleges that Edyta told their daughter that he was manipulating her and that he did not want to see the children for Christmas. He is also concerned about allegations Edyta made in an affidavit submitted at a hearing on temporary matters. But Edyta insists that she supports the joint physical care arrangement and that "[t]hese isolated issues are woefully insufficient to overcome the weight of the evidence presented that . . . despite any differences, the parties were nevertheless able to co-parent effectively." The district court noted that the parties distrust each other and sometimes question each other's motives, but the degree of conflict between them is not as extreme as in some cases.

***Children's Wishes***. A strong point of contention is whether the children would prefer to be in David's physical care and how much weight should be given to their preference. On the one hand, David asserts: "There is little doubt the Barche children *do not* favor a shared care arrangement." On the other hand, Edyta suggests that "[a]ny alleged preference the children may or may not have had is of little, if any, weight in this matter." Contrary to Edyta's suggestion, we must weigh the children's wishes. *See* Iowa Code § 598.41(3)(f) (requiring the court to consider "[w]hether the custody arrangement is in accord with the child's

wishes or whether the child has strong opposition, taking into consideration the child's age and maturity").

Both children repeatedly told their GAL that they did not want to be placed primarily in Edyta's care. The thirteen-year-old daughter wrote a stinging letter to the GAL expressing, among other things: "[Edyta] is a horrid person and I hope she goes to hell"; and "I never want to go back to her house again ever . . . I don't want to live with her at all." The GAL said the letter was consistent with how the daughter spoke about her mother. The eight-year-old son also made concerning statements about Edyta. One of his teachers reported that he told his class that his mom was trying to put his dad in jail, and if that happened, he would kill his mom and set the house on fire. We find the district court's assessment of the children's statements persuasive.

> [The daughter's letter to the GAL] is not a thoughtful, well-reasoned, mature, or appropriate expression of a preference for one parent over the other. It is an expression of deep anger, hurt, and frustration from a young woman in her early teens whose expectations and daily routines have been seriously disrupted, whose family is no longer the cohesive unit that it seemed to be, and who lacks control over many decisions adults make that affect her every day. It is consistent with [Edyta's] perception that the children blame her for the divorce. The children's negative statements about [Edyta] are consistent with anxiety about losing frequent, very-much-wanted contact with their father because of the dissolution proceedings that [Edyta] initiated.

In deciding whether joint physical care is appropriate, we give careful consideration to the findings of the district court. *See In re Marriage of Wilson*, 532 N.W.2d 493, 495−96 (Iowa Ct. App. 1995). After considering the statutory factors and our case law, the district court found that joint physical care, using the rotating two-two-three schedule proposed by the GAL, was in the best interests of the children. We agree.

Continuing that arrangement provides the children with stability and maximum contact with both parents, while approximating the caregiving to which they are accustomed.  *See* Iowa Code § 598.41(1)(a); *Hansen*, 733 N.W.2d at 696−98.  Despite their disagreements, overall, the parents can successfully communicate about the children's care.  *See Hansen*, 733 N.W.2d at 698.  Granted, the parents' conflicts have caused emotional distress to the children.  But those conflicts have not significantly impacted their ability to follow the court-ordered schedule.  *See id.* at 698−99.  Lastly, the parents generally agree in their approach to daily matters, such as the children's schooling and participation in extracurricular activities.  *See id.* at 699.  In light of these considerations, we agree with the district court that a physical care arrangement, using the rotating two-week, two-two-three-day schedule proposed by the GAL, is in the best interests of the children.  Therefore, we affirm the physical care award.

### B.  Spousal Support

Edyta requested $1100 in monthly spousal support until their youngest child reaches the age of eighteen.[6]  The district court awarded her $800 per month for ten years.  But the decree did not ascribe a label to the support.  In making the award, the court considered David's greater income: he earns $90,436 per year while Edyta makes only $42,000, even with a recent advancement.  David's job also allows him to rent housing at about half the amount that Edyta must pay.  The

---

[6] Their son was eight years old at the time of the dissolution.  Edyta's counsel explained at oral argument that her need for spousal support was greatest while the children remained in her home.

court noted that Edyta had no plans to seek additional education. As for the property award, David received about $2243 more in assets than Edyta.

David argues that Edyta does not need spousal support because her salary surpasses her monthly expenses. Plus, he points to her income-generating property in Poland and Michigan.[7] David also notes that given the change in federal law the payment of spousal support will not afford him tax benefits. Edyta defends the spousal support award. She stresses that David is in "a significantly better financial position than [she] is or would be in the near future."

Although our review is de novo, we allow the district court considerable latitude in awarding spousal support. *In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022). Because the district court is in a better position to balance the parties' needs, "we should intervene on appeal only when there is a failure to do equity." *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015).

Unlike child support, we do not operate under spousal-support guidelines. Instead, we do equity based on the statutory criteria. Those criteria include: "[t]he length of the marriage"; "[t]he age and physical and emotional health of the parties"; "[t]he distribution of property"; "[t]he educational level of each party"; "[t]he earning capacity of the party seeking maintenance"; "[t]he feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably

---

[7] David's argument disregards the fact that he was awarded the Fayette property, which generates rental income of $900 per month. As for Edyta, she receives $766 from the Michigan property and $583 from the property in Poland—for an extra $1349 per month combined. The district court concluded that the income from the Polish property was unclear and did not include that amount in its spousal support calculation. We have considered the rental incomes each party receives in assessing the spousal support award.

comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal"; and "[t]he tax consequences to each party." Iowa Code § 598.21A. Our case law supplements these factors by balancing "the comparative weight or importance of certain statutory criteria relative to others." *In re Marriage of Mauer*, 874 N.W.2d 103, 107 (Iowa 2016). Often our cases emphasize the duration of the marriage and the spouses' earning capacities. *Id.*

Turning to that case law, our supreme court now recognizes four types of alimony: rehabilitative, reimbursement, traditional, and transitional. *In re Marriage of Pazhoor*, 971 N.W.2d 530, 539, 545 (Iowa 2022). The first two types are not implicated here.[8] The question is whether the award was proper as either traditional or transitional support.

Traditional spousal support is meant to provide the receiving spouse with means comparable to what they would have enjoyed if the marriage continued. *Gust*, 858 N.W.2d at 408. As a general rule, marriages lasting at least twenty years merit serious consideration for traditional spousal support. *In re Marriage of Sokol*, 985 N.W.2d 177, 185 (Iowa 2023). Traditional support is ordinarily of indefinite duration, often payable until the death of either party or the payee's remarriage. *Gust*, 858 N.W.2d at 412. But it may end sooner if the payee spouse shows "the capacity to close the gap between income and need" or it is fair to require that spouse "to bear the remaining gap between income and reasonable

---

[8] Rehabilitative alimony supports an economically dependent spouse through a limited period of education and retraining. *In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998). Reimbursement alimony is available if one spouse made economic sacrifices during the marriage that advance the earning capacity of the other spouse. *Id.*

needs." *Id.* By contrast, "transitional alimony is appropriate when a party capable of self-support nevertheless needs short-term financial assistance to transition from married to single life." *Pazhoor*, 971 N.W.2d at 545. The relief "should be of a short duration." *Sokol*, 985 N.W.2d at 186 (citation omitted) (rejecting award of "transitional" spousal support that lasted seven years).

With those two spousal-support categories in mind, we turn to the relevant factors in section 598.21A(1). First, the parties were married for roughly twenty-one years. *See* Iowa Code § 598.21A(1)(a). This factor weighs in favor of a traditional alimony award. Other factors are less definitive. For example, both parties are employed and share physical care of the children. Neither has serious health conditions. Neither is close to retirement age. *See id.* § 598.21A(1)(b). Neither received an outsized property award. *See id.* § 598.21A(1)(c). Each hold advanced degrees: David has a doctorate in psychology, and Edyta has a master's degree in international management.[9] And she has no plans to seek further education. *See id.* § 598.21A(1)(e).

The record shows that the parties lived within their means during the marriage. But David was the primary income earner for the family—bringing in about seventy percent of their combined wages for the past four years. *See id.* § 598.21A(1)(f). We recognize that [a]limony "payments are no longer tax-deductible, enhancing the burden on the payor, and alimony is no longer considered taxable income to the recipient, enhancing the value of the award." *Pazhoor*, 971 N.W.2d at 542. But even considering those tax consequences,

---

[9] Both parties obtained some form of higher degree while married.

because Edyta earns less than half as much as David does and will not likely match his earning potential in her field, spousal support is appropriate.[10]

Edyta argues it is "indisputable" that the district court awarded her transitional alimony. We disagree. The ten-year award is best categorized as traditional alimony. It's true that Edyta was awarded less than $10,000 in liquid assets.[11] *See Sokol*, 985 N.W.2d at 186 (discussing need for transitional alimony when requesting spouse has few liquid assets to meet these immediate needs). But the ten-year duration of the award is inconsistent with the short-term purposes of transitional alimony. *Id.* at 187.

After weighing all the pertinent factors, we find spousal support of $800 per month is equitable. That award will allow Edyta a lifestyle similar to the one she enjoyed during the marriage and will not cause David financial hardship. Edyta asked for the ten-year duration, anticipating she could "close the gap" between her income and reasonable needs after she was no longer responsible for the children's everyday expenses. We affirm this award of traditional alimony.

## C. Guardian Ad Litem Fees

David sought the appointment of a GAL for the children. He paid the initial retainer along with the GAL's expenses up until the time of trial. At trial, he asked the court to order Edyta to pay the balance of the GAL fees. The court denied David's request. It ordered David to pay all GAL fees and "the remaining court costs." David now contends that "[t]he trial court erred in failing to allocate an

[10] Another factor weighing in favor of support is that David can rent a duplex through his job for half the going rate. *See* Iowa Code § 598.21A(1)(j).
[11] The other assets awarded to Edyta were real property and retirement accounts, limiting her ability to bridge the gap between married and single life.

equitable share of the [GAL's] fees to Edyta." He requests that "Edyta pay 40% of the [GAL's] fees once his prior $9,000 payment [is] considered." He does not request that a portion of the other court costs be allocated to Edyta.

We review the allocation of GAL fees for an abuse of discretion. *In re Marriage of Van Genderen*, No. 16-0790, 2017 WL 2684339 at *2 (Iowa Ct. App. June 21, 2017). Iowa Code section 598.12(3) governs this issue:

> The court shall enter an order in favor of the [GAL] for fees and disbursements as submitted by the [GAL], and the amount shall be charged against the party responsible for court costs unless the court determines that the party responsible for court costs is indigent, in which event the amount shall be borne by the county.

Under that statute, GAL fees are split between the parties in the same way as other court costs. *See In re Marriage of Loftin*, No. 11-0508, 2011 WL 5394445, at *5 (Iowa Ct. App. Nov. 9, 2011). Because the district court ordered David to pay the remaining court costs, it properly ordered him to also pay the GAL fees in full. *See id.* The court did not abuse its discretion under the plain meaning of section 598.12(3). Thus, we affirm the district court's order.

### D. Credit for Health Insurance Premium

David maintains health insurance for himself and the children through his work. He will continue to do so after the divorce. David asks that the amount he spends to insure the children be deducted from his child support payments, as specified in Iowa Court Rule 9.14(5). David provided pay stubs and clarified in his testimony that the costs associated with the health insurance were only for the

children. The record is unclear as to the amount to be deducted.[12] But it is clear that the amount in question went to the children's coverage. We modify this provision of the decree and remand for recalculation of child support with the deduction for the children's health insurance paid by David.

### E. Appellate Attorney Fees

Lastly, Edyta seeks an award of $8000 in appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests in our discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). "We consider the needs of the party making the request, the ability of the other party to pay, and whether the party was required to defend the district court's decision on appeal." *Id.* Considering the merits of the appeal and Edyta's success on a majority of the issues, her request for appellate attorney fees is reasonable. Because she has not yet submitted an affidavit of costs, we remand for the district court to determine a reasonable award not to exceed $8000.

### AFFIRMED AS MODIFIED AND REMANDED.

---

[12] Based on the pay stubs, the bi-monthly cost appears to be $90 for medical and $22 for dental insurance. Making a total of $224 a month for insurance. On appeal, David asks for $240 to be deducted from his child support.